[No. 24906-1-I.    Division One.    May 26, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES O.
BURCH, *Appellant*.

*Patricia Novotny* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Theresa Fricke, Senior Prosecuting Attorney,* for respondent.

*James E. Lobsenz* on behalf of Northwest Women's Law Center, amicus curiae for appellant.

PEKELIS, J. — James O. Burch appeals from his conviction for second degree escape. He contends that the State intentionally exercised its peremptory challenges on the basis of race and gender in excluding blacks and women from the petit jury in violation of his constitutional and statutory rights. We reverse and remand.

## I
### FACTS

Burch, who is black,[1] was charged by information with two counts each of first degree rape and first degree burglary. The counts were severed and separate trials ordered. On December 16, 1987, Burch was convicted of one count of first degree rape and one count of second degree burglary.

On December 18, 1987, as the jury was being selected for Burch's second trial on the remaining counts of first degree rape and first degree burglary, Burch fled from the courtroom. After a brief chase, Burch was apprehended and returned to jail. A mistrial was declared. Burch was not tried again because on February 1, 1988, he pleaded guilty to first degree rape and second degree burglary. On March 18, 1988, Burch was sentenced on his four convictions.

Burch was then charged with second degree escape for fleeing from the courtroom. At trial, Burch asserted the defense of necessity, and he and his wife, Rebecca Burch, testified on his behalf. The jury was unable to reach a verdict, and a mistrial was declared.

A second trial was scheduled, and jury selection commenced on July 5, 1988. The venire consisted of 15 men and 9 women.[2] Three of the venire persons were black. During voir dire, the trial court excused one black venire person for cause, leaving only two blacks on the venire, Nona Richardson and Thomas L. Suggs.

---

[1]We use the term "black" instead of "African American" because it is the term used by Burch in his brief to this court.

[2]This was the second venire. The original venire was excused as a result of the trial court inadvertently telling the jury the nature of the felony charges for which Burch was being tried at the time of his escape.

After the State had exercised two of its peremptory challenges, striking the black woman, Ms. Richardson, and a white woman, the trial court took a recess. Before voir dire was resumed, the following colloquy occurred between the trial court and defense counsel:

THE COURT: Do you wish to put something on the record?
MR. MULLIGAN: It can wait. There are going to be a few things we need to take up before opening statements, so I assume we will just take it up then.
THE COURT: It's nothing to do with jury selection?
MR. MULLIGAN: Nothing to do with jury selection right now.

Jury selection continued. Each side exercised all six of its allotted peremptory challenges, thereby necessitating a supplemental venire of five, all of whom were white. In all, the State challenged three men and three women, including the venire's only blacks, Ms. Richardson and Mr. Suggs. An all-white jury composed of 10 men and 2 women was selected. One of the female jurors was drawn from the supplemental panel after the State had exhausted its peremptory challenges.

After the remaining venire persons were excused and the jury was sworn, Burch made an oral motion for a mistrial based on the alleged systematic exclusion of blacks from the jury pool and on the underrepresentation of blacks on the venire in his case. The motion was denied.

Burch made a second oral motion for dismissal or, in the alternative, for a mistrial based on "prosecutorial misconduct in the selection of this jury and through the exclusion of all blacks left in the panel." Burch also requested an evidentiary hearing on the motion. The trial court denied this motion and also denied Burch's request for a hearing because it did not want to interrupt the trial.

Trial commenced on July 6, 1988. Burch testified that while in jail awaiting trial on the rape and burglary counts, his wife related certain incidents which convinced him that he should attempt to escape in order to avoid his second trial. Burch also testified that while in jail he received a letter threatening him and his family with death if he

proceeded to his second trial. According to Burch, the letter also contained racial slurs against him and his wife, who is white, and their 4-year-old daughter. Burch testified that he attempted to commit suicide before his second trial commenced.[3] Burch testified further that he eventually pleaded guilty to the charges to avoid his second trial.

Rebecca Burch testified that after her husband's arrest on the rape and burglary charges, she began receiving anonymous telephone calls in which she and her daughter were subjected to racial insults. She also testified that after Burch's first trial, the anonymous calls became threatening and she was told she and her daughter would be killed if Burch proceeded to his second trial.

On the second day of trial, the deputy prosecutor requested an opportunity to place on the record her reasons for striking the challenged venire persons. Later that day, at the conclusion of all the evidence, the trial court took the deputy prosecutor's sworn testimony explaining the State's challenges. The deputy prosecutor denied that any of the State's challenges had been racially motivated. She explained that she had served as trial deputy at Burch's first escape trial and had found Rebecca Burch to be a "very effective" witness, noting specifically that she had "cried considerably" during her testimony. Thus, when she was assigned to prosecute Burch's second escape trial, the deputy prosecutor "decided, having heard and observed everything [in the previous trial], what kind of a jury [she] thought would best present or would be more receptive to the State's case":

> Given the fact that [all prospective jurors] promise to be fair and impartial to the facts, I had decided, even before I was assigned to this courtroom, that what I would prefer, as the trial deputy, *was preferably an all male jury, or as many males as I could get on the jury*, and preferably a very educated jury.

(Italics ours.) The deputy prosecutor also acknowledged that a juror in Burch's first escape trial, which had resulted in a

---

[3]This was confirmed by jail personnel.

hung jury, told her afterward that two black female jurors had voted not guilty and that one black male juror and one white female juror had been undecided. The deputy prosecutor then proceeded to provide the trial court with specific explanations for peremptorily challenging each venire person.

The trial court also allowed Burch to testify. Burch testified that after a mistrial was declared in his first escape trial, he overheard a corrections officer tell the deputy prosecutor, " 'You know what happened, right?' . . . 'Next time, get rid of all the black jurors.' " Burch testified that the deputy prosecutor responded, " 'I have to.' " The deputy prosecutor denied making this statement. The trial court did not resolve this factual dispute.

The jury found Burch guilty of second degree escape. Judgment was entered, and Burch was sentenced to 14 months' confinement to be served consecutively with his earlier sentences. On appeal, Burch challenges his conviction on constitutional and statutory grounds, contending that the State intentionally exercised its peremptory challenges first, on the basis of race, and second, on the basis of gender, in excluding blacks and women from the jury.

## II
### DISCUSSION
### A. Gender-Based Peremptory Challenges

We address first Burch's gender discrimination claim. Burch contends that the State's exercise of peremptory challenges against three female venire persons was gender based and therefore violative of the federal constitution's equal protection guaranty. Burch also asserts that the State's gender-based challenges violate Washington's Equal Rights Amendment (ERA), Const. art. 31.

#### Federal Equal Protection ·

■ The United States Supreme Court has held that the use of race-based peremptory challenges to exclude blacks from petit juries is a form of race discrimination. *Batson v. Kentucky*, 476 U.S. 79, 88-89, 90 L. Ed. 2d 69, 106 S. Ct.

1712 (1986). According to the Court, such use of peremptory challenges violates a black criminal defendant's equal protection right not to have members of his or her race excluded from the petit jury on account of race or on the false assumption that black jurors as a group are not qualified to serve as jurors. *Batson,* 476 U.S. at 86. In addition, race-based peremptory challenges are violative of the equal protection rights of the excluded venire persons who are denied a significant opportunity to participate in civic life. *Powers v. Ohio,* ___ U.S. ___, 113 L. Ed. 2d 411, 423-24, 111 S. Ct. 1364, 1370 (1991).

Furthermore, the Supreme Court has held that the systematic exclusion of women from jury venires is a form of gender discrimination which violates a criminal defendant's right to a representative jury venire guaranteed by the Sixth Amendment. *Taylor v. Louisiana,* 419 U.S. 522, 537, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975). The question the Court has yet to address is whether the principles established in *Batson* also prohibit the exercise of gender-based peremptory challenges to exclude women from petit juries.

However, this issue was recently addressed by the Ninth Circuit of the United States Court of Appeals in *United States v. De Gross,* 960 F.2d 1433 (9th Cir. 1992) (en banc), *reversing and remanding* 913 F.2d 1417 (1990). In *De Gross,* the Ninth Circuit held that equal protection principles prohibit the use of gender-based peremptory challenges to exclude women from the petit jury. *De Gross,* at 1439. *Accord, People v. Irizarry,* 165 A.D.2d 715, 716, 560 N.Y.S.2d 279, 280 (1990); *contra, United States v. Hamilton,* 850 F.2d 1038, 1042-43 (4th Cir. 1988), *cert. dismissed sub nom. Washington v. United States,* 489 U.S. 1094 (1989), *cert. denied,* 493 U.S. 1069 (1990); *State v. Oliviera,* 534 A.2d 867, 870 (R.I. 1987).

In *De Gross,* the government objected on equal protection grounds to De Gross's peremptory challenge of a male venire person. *De Gross,* at 1435. At that point, De Gross had exercised seven peremptory challenges against male venire persons. *De Gross,* at 1435-36. The District Court ruled that the government had established a prima facie case of dis-

crimination and disallowed the peremptory challenge when De Gross offered no justification for it. Later, the government challenged the venire's only Hispanic, prompting De Gross, a Hispanic woman, to object on equal protection grounds. When directed by the District Court to justify the challenge, the government responded that its main reason for excusing the venire person was because she was a woman and the government desired more men on the jury. *De Gross*, at 1436, 1442. The District Court accepted the government's explanation and allowed the challenge. *De Gross*, at 1436.

De Gross appealed, arguing that the District Court erred in refusing to allow her eighth peremptory challenge against the male venire person and by permitting the government to challenge the Hispanic venire person on the basis of her gender. *De Gross*, at 1436, 1442. The Ninth Circuit rejected De Gross's contention that she should have been permitted to continue removing men from the jury, but agreed with her assertion that the government acted improperly in challenging the Hispanic venire person on the basis of gender. *De Gross*, at 1442-43.

In reaching its decision, the Ninth Circuit determined that all the evils associated with racially discriminatory peremptory challenges also result from peremptory challenges based on gender. *De Gross*, at 1437-38. First, the court found that, like race-based challenges, gender-based challenges harm the defendant by violating his or her right to be tried by a jury chosen pursuant to nondiscriminatory criteria. *De Gross*, at 1438. The court also determined that gender-based peremptory challenges, like those based on race, harm the excluded venire person because discriminatory challenges are based on group membership, not upon an individual's qualifications. *De Gross*, at 1438-39 (citing *Batson*, 476 U.S. at 87).[4] Further, the court found that gender-based exclusions from the jury undermine public

---

[4] In *Batson*, the Supreme Court stated that "[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply 'is unrelated to his [or her] fitness as a juror.'" (Citation omitted.) 476 U.S. at 87.

confidence in the fairness of the criminal justice system and act as "a stimulant to community prejudice which impedes equal justice for women." *De Gross*, at 1438 (citing respectively *Taylor*, 419 U.S. at 530 and *Batson*, 476 U.S. at 87-88).

The court then applied the constitutional test for gender classification to gender-based peremptory challenges: whether such challenges are substantially related to the achievement of an important governmental objective.[5] *De Gross*, at 1439. The court held that peremptory challenges are a necessary means for achieving the important governmental objective of impaneling an impartial jury because "[a] party is not always able to justify his [or her] sudden and immediate impression that a particular venireperson will be partial." *De Gross*, at 1439. However, the court reasoned that gender-based challenges are not founded on a party's sudden impression of a particular venire person's ability to be impartial, but rather, like challenges based on race, "are based either on the false assumption that members of a certain group are unqualified to serve as jurors, . . . or on the false assumption that members of certain groups are unable to consider impartially the case against a member or a nonmember of their group." (Citations omitted.) *De Gross*, at 1439. For these reasons the court concluded that discriminatory challenges do not assist in achieving an impartial jury. *De Gross*, at 1439 (citing *Batson*, 476 U.S. at 98-99).

We agree with the reasoning in *De Gross*. Thus, we also conclude that the federal constitution's equal protection guaranty prohibits peremptory challenges exercised on the basis of a venire person's gender.

### Equal Rights Amendment

■ Burch also contends that the State's gender-based challenges violated Washington's ERA, Const. art. 31, which provides that "[e]quality of rights and responsibility under the law shall not be denied or abridged on account of sex."

---

[5]*See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-41, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985).

The protections provided by the ERA go beyond those of the equal protection guaranty under the federal constitution. *Darrin v. Gould*, 85 Wn.2d 859, 540 P.2d 882 (1975). *See Marchioro v. Chaney*, 90 Wn.2d 298, 305, 582 P.2d 487 (1978), *aff'd*, 442 U.S. 191 (1979). Under the ERA, if equality is restricted or denied on the basis of gender, the classification is discriminatory and, thus, violative of the Washington Constitution. *Marchioro*. Hence, gender-based peremptory challenges, which constitute an obvious denial of female venire persons' equal rights and responsibilities on the basis of gender, are discriminatory and, thus, impermissible under the ERA.

## B. Standing

Having concluded that both federal and state constitutional principles apply to the exercise of gender-based peremptory challenges, we address next whether Burch has standing to object to the State's alleged gender-based challenges on constitutional grounds even though he is not a member of the excluded class. We conclude that he does.

■ In *Powers*, the United States Supreme Court held that a white criminal defendant had standing to raise the equal protection rights of black venire persons who were excluded from jury service through the State's race-based peremptory challenges. 111 S. Ct. at 1373. In reaching its decision, the Court applied the rules of third party standing, which require a showing that: (1) the litigant has suffered an " 'injury-in-fact' ", which gives him or her a " 'sufficiently concrete interest' " in the outcome of the issue in dispute; (2) the litigant has a "close relation to the third party," and that; (3) there exists "some hindrance to the third party's ability to protect his or her own interests." *Powers*, 111 S. Ct. at 1370-71 (quoting *Singleton v. Wulff*, 428 U.S. 106, 112-16, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976)).

The Court concluded that the white defendant in *Powers* was injured by and had a concrete interest in the State's race-based use of peremptory challenges because "racial discrimination in the selection of jurors 'casts doubt on the

integrity of the judicial process,' . . . and places the fairness of a criminal proceeding in doubt." (Citation omitted.) *Powers*, 111 S. Ct. at 1371 (quoting *Rose v. Mitchell*, 443 U.S. 545, 556, 61 L. Ed. 2d 739, 99 S. Ct. 2993 (1979)). Second, the Court concluded that the white defendant had a close relationship to the excluded black venire persons because all had "a common interest in eliminating racial discrimination from the courtroom." *Powers*, 111 S. Ct. at 1372. Finally, the Court concluded that "daunting" barriers existed, *e.g.*, the difficulty in obtaining injunctive relief and the cost of litigation compared to the small financial stake involved, which made it unlikely that an excluded venire person would sue to protect his or her own equal protection rights. *Powers*, 111 S. Ct. at 1373.

We hold that this same analysis applies under both the federal and state constitutions to allow male criminal defendants third party standing to raise equal protection claims on behalf of women who, through the State's gender-based use of peremptory challenges, are wrongfully excluded from the jury. *Accord, People v. Irizarry*, at 716-17.

## C. Waiver

Burch raises his gender discrimination claim for the first time on appeal. As a general rule, appellate courts will consider "manifest error affecting a constitutional right" even if the issue was not raised in the trial court. RAP 2.5(a)(3); *accord, State v. Hieb*, 107 Wn.2d 97, 108, 727 P.2d 239 (1986). The State contends that Burch has waived his right to appellate review of his *Batson* claim because he raised it after the jury was impaneled.

However, the United States Supreme Court has not established at what point a defendant must raise a *Batson* objection, but rather has authorized state courts to adopt procedural requirements relating to such claims. *Ford v. Georgia*, 498 U.S. 411, 112 L. Ed. 2d 935, 111 S. Ct. 850 (1991), which is cited by the State, does not provide support for its contention that Burch was required to raise his claim before the jury was impaneled. In *Ford*, the Georgia

Supreme Court refused to consider the merits of a defendant's claim that the State's peremptory challenges were race based because the defendant failed to comply with a state procedural requirement that such claims "be raised prior to the time the jurors selected to try the case are sworn.' " 111 S. Ct. at 856 (quoting *State v. Sparks*, 257 Ga. 97, 98, 355 S.E.2d 658, 659 (1987)). In deciding the case on other grounds, the United States Supreme Court merely *noted* that state courts were empowered to adopt procedural requirements relating to *Batson* claims and characterized Georgia's requirement as "a sensible rule". *Ford*, 111 S. Ct. at 857 (citing *Batson*, 476 U.S. at 99-100).

Washington has not yet adopted a rule stating when a *Batson* objection must be raised. The State's assertion that such a rule was established in *State v. Morales*, 53 Wn. App. 681, 769 P.2d 878, *review denied*, 112 Wn.2d 1028 (1989) is without merit. In *Morales*, Division Two of this court considered a defendant's *Batson* claim and concluded there was no purposeful discrimination. 53 Wn. App. at 686. The court, in an ambiguous statement that was dicta in any event, stated that *Batson* claims "should be raised prior to presentation of the evidence . . . to avoid the *possible* issue of waiver." (Italics ours.) *Morales*, 53 Wn. App. at 686.

■ This comment is not controlling. Only the Washington Supreme Court is authorized to amend RAP 2.5 by creating a procedural default rule stating when *Batson* claims must be raised. *See* RCW 2.04.190. Although an earlier objection is the better practice because it places the issue before the trial court initially, because our Supreme Court has not yet created such a rule, Burch is not barred from raising his *Batson* claim for the first time on appeal.

### D. Prima Facie Case of Gender Discrimination

Because we hold that the principles enunciated in *Batson* apply to gender-based discrimination, we similarly follow the test set out in *Batson* in determining whether a prima facie case of purposeful discrimination has been established.

██ Under *Batson*, where as here, the defendant's claim is based on the equal protection rights of the excluded venire persons, the defendant establishes a prima facie case first by showing that the peremptory challenge was exercised against a member of a constitutionally cognizable group. *See De Gross*, at 1442 (citing *Batson*, 476 U.S. at 96). Second, the defendant must demonstrate that this fact "and any other relevant circumstances raise an inference" that the prosecutor's challenge of a venire person was based on group membership. *See Batson*, 476 U.S. at 96.

In deciding whether a prima facie case has been established, the trial court "should consider all relevant circumstances", including a "pattern" of strikes against members of a constitutionally cognizable group and the "prosecutor's questions and statements during *voir dire* examination". *Batson*, 476 U.S. at 96-97.

Once the defendant has established a prima facie case of purposeful discrimination, the burden shifts to the State to "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98. An explanation is neutral unless a discriminatory intent is inherent therein. *Hernandez v. New York*, ___ U.S. ___, 114 L. Ed. 2d 395, 111 S. Ct. 1859, 1868 (1991). A venire person's specific responses and demeanor during voir dire may constitute neutral explanations for exercising a peremptory challenge. Conversely, expressing an intention to exclude on the basis of group membership or on stereotypical assumptions about members of certain groups does not constitute a neutral explanation. *Hernandez*, 111 S. Ct. at 1867. In addition, the State's neutral explanation must be " 'clear and reasonably specific' ". *Batson*, 476 U.S. at 98 n.20 (quoting *Texas Dep't of Comm'ty Affairs v. Burdine*, 450 U.S. 248, 258, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).

Normally, the trial court has the duty to determine if the defendant has established purposeful discrimination by the State. *Batson*, 476 U.S. at 98. Because the trial court's findings "largely will turn on evaluation of credibility," *Batson*,

476 U.S. at 98 n.21, they will not be set aside unless clearly erroneous. *Hernandez*, 111 S. Ct. at 1871.

Here, however, in defending herself from the accusation that she was challenging venire persons on the basis of their race, the deputy prosecutor admitted that it was not race, but gender considerations that were motivating her. She asserted that she was hoping to secure an all-male jury or a jury with "as many males as [she] could get". The deputy prosecutor explained that, as trial deputy in Burch's first escape trial, she found Rebecca Burch to be a "very effective" witness due to the fact that she "cried considerably" during her testimony. Furthermore, the deputy prosecutor exercised three of the State's peremptory challenges against female venire persons. Thus, the deputy prosecutor not only admitted to having a general intent to exclude women from the jury, but she actually did challenge three female venire persons.

Burch argues that the deputy prosecutor's statement acknowledging her preference for an all-male jury should be dispositive on the issue of purposeful gender-based discrimination. The State, on the other hand, contends that the statement was merely one of preference and does not evidence that the State's *actual* challenges were gender based.

█ We agree with the State that the deputy prosecutor's statement is not dispositive here.[6] However, her statement, combined with her subsequent challenges against three female venire persons, did raise a strong inference that the women were excused based on the assumption that, as women, they would be swayed by the emotion of Rebecca Burch's testimony. Moreover, this inference is reinforced by the deputy prosecutor's acknowledgment that she was aware that three of the four jurors who voted to acquit or were undecided in Burch's first escape trial were women.

The State argues that Burch failed to establish a prima facie case because its challenges against the three female venire persons did not constitute a "systematic exclusion" of

---

[6]*Cf. De Gross*, at 1442-43 (prosecutor's gender-based explanation for striking *particular* venire person established prima facie case of discrimination).

women from the jury. We disagree. There is "no magic number of challenged jurors" which automatically establishes a prima facie case of discrimination. *United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989); *accord, Batson*, 476 U.S. at 97 (while "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination . . . [t]hese examples are merely illustrative"). *Batson* clearly directs that the trial court consider "all relevant circumstances" in determining whether an inference of discrimination has been raised. 476 U.S. at 96-97. Under the circumstances here, we conclude that Burch has established a prima facie case of purposeful gender discrimination.

### E. Rebuttal

The remaining issue is whether the State rebutted the strong inference of purposeful gender-based discrimination established by Burch. The State contends that it has done so, relying on the deputy prosecutor's specific reasons for challenging the three female venire persons which the State claims were gender neutral.

The deputy prosecutor's specific explanations for striking each woman from the venire may be summarized as follows:

1. Patricia Ogden: The deputy prosecutor stated that she challenged Ms. Ogden because she was "uneducated" and "appeared to be easily swayed". The deputy prosecutor believed Ms. Ogden would be "very receptive" to and "swayed by" Rebecca Burch's testimony. However, the deputy prosecutor provided no reasonably specific basis, *i.e*, Ms. Ogden's particular responses or demeanor during voir dire, for her conclusion that Ms. Ogden would be "easily swayed". Thus, far from rebutting the strong inference of gender-based discrimination, this explanation actually reinforces the inference that the deputy prosecutor's challenge to Ms. Ogden was, at least in part, gender based because it appears to be founded on stereotypical assumptions about women as being "easily swayed" by appeals to their emotions.

2. <u>Nona Richardson</u>: The deputy prosecutor challenged Ms. Richardson, who is black, because she believed that, as a nurse at Harborview's outpatient women's clinic, which provides treatment for abused women, Ms. Richardson would find Rebecca Burch to be "extremely credible" in testifying that she felt she could not notify the authorities about the anonymous threats against herself and her daughter. The deputy prosecutor also believed that Ms. Richardson would be partial to the defense because of her participation in church organizations and because she seemed to be "family oriented". On balance, this explanation appears to be gender neutral.

3. <u>Sandra L. Rowe</u>: The deputy prosecutor challenged Ms. Rowe because she believed that as "the mother of six children" whose "activities were centered around her children", Ms. Rowe "would have been very susceptible and sympathetic; she would allow sympathy to sway her in making her decision."

Again, this explanation is not based on any specific response given by Ms. Rowe or on her demeanor, nor was it based on any identifiable particular fact of her life. Rather, the conclusion that Ms. Rowe would be overly susceptible and sympathetic to the point of letting emotion rule her reason was based solely on her status as a full-time mother. At bottom, the deputy prosecutor's explanation for excusing Ms. Rowe is not gender neutral because it is founded on gender stereotypes which view women as generally governed by emotion, instinct, and feeling rather than reason, judgment, or common sense.[7]

---

[7]Ironically, these are the same gender stereotypes relied upon by the Wisconsin Supreme Court over 100 years ago to justify denying a woman admittance to the bar. *See In re Goodell*, 39 Wis. 232, 245 (1875). The court believed that Ms. Goodell was not qualified to practice law because, among other reasons, "[t]he peculiar qualities of womanhood, its gentle graces, its quick sensibility, its tender susceptibility, its purity, its delicacy, its emotional impulses, its subordination of hard reason to sympathetic feeling, are surely not qualifications for forensic strife." *In re Goodell*, 39 Wis. at 245. For evidence that such gender stereotypes still exist, see Eich, *Gender Bias in the Courtroom: Some Participants Are More Equal Than Others*, 69 Judicature 339 (April/May 1986).

Furthermore, our conclusion that the deputy prosecutor's reasons were not gender neutral is reinforced by the noticeable differences between the vague and stereotypical reasons given for the State's challenges against the female venire persons as compared to the very specific and particularized reasons given for the challenges against the male venire persons. Ray Perry, for example, was challenged because he indicated that due to a particular negative incident involving law enforcement in his past, he might not be impartial. Carl E. Linden was challenged because he was a "social worker-type" who worked with delinquent girls at Echo Glen and because his responses during voir dire indicated he would find it difficult to sit in judgment of Burch. In our view, these represent classic examples of the specific type of responses which will lead to a challenge by the State.

In contrast to the male venire persons who were challenged based on an assessment of their individual qualifications and their ability to be impartial, the female venire persons (with the possible exception of Ms. Richardson) were challenged for reasons that were based at least in part on gender stereotypes, *i.e.*, that, as women, they would be unable to consider impartially the State's case against Rebecca Burch's husband in face of her emotional testimony.

As we have noted, the determination as to whether the inference of purposeful discrimination has been rebutted is generally the function of the trial court. Here, the trial court failed to resolve this issue. This would usually require remanding the matter for such a determination. However, under the unique circumstances here, *i.e.*, the strong prima facie case created by the deputy prosecutor's initial statements coupled with her explanations for her actual challenges against the three female venire persons, we find remand to be unnecessary. The deputy prosecutor's specific reasons for challenging each female venire person simply were not, as a matter of law, gender neutral. Hence, the State did not rebut the strong inference that it engaged in purposeful gender discrimination in exercising its peremptory challenges.

Because this constitutes a violation of the excluded venire persons' federal and state constitutional rights, we reverse and remand for a new trial.

SCHOLFIELD and BAKER, JJ., concur.

Reconsideration denied July 21, 1992.