[No. 35341-1-I.   Division One.   June 3, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. EARL DEONISS RHODES, *Appellant*.

---

[17]*State v. Craven*, 69 Wn. App. 581, 588, 849 P.2d 681, *review denied*, 122 Wn.2d 1019 (1993).

*Douglas J. Ende* and *Ende, Subin & Philip*; and *Nielsen & Acosta*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Deborah A. Dwyer, Deputy*, for respondent.

AGID, J. — Earl Rhodes appeals his conviction for second degree burglary, arguing that the trial court erred when it rejected his objection to the State's exercise of a peremptory challenge as improperly based on race.[1] We conclude that the trial court properly ruled that there was no evidence that the State's challenge was racially motivated and affirm.

## Facts

Shortly before 11 p.m. on July 2, 1994, Seattle police officers responded to a 911 call reporting shattered glass at a business known as Karen's Nail Works on Aurora Avenue. When officers arrived, they saw Rhodes leaving the premises through the shattered door. After his arrest, Rhodes explained to the officers that he had just come by bus from Everett and was waiting for another bus when he heard breaking glass and saw two long-haired white males inside Karen's Nail Works. When he walked over to "check it out," they ran off and he went in to look around. Rhodes told the officers he was inside for no more than a minute before he came out. After Rhodes' arrest, Ronald Easterday approached the investigating officers. He told them that he had seen a large African-American man in a tan jacket sitting on the sidewalk in front of Karen's Nail Works when he drove to a restaurant about 75 feet away through the adjacent parking lot earlier that evening. The officers asked Easterday to take a look at Rhodes, who was seated in the back of a patrol car. Although Rhodes was not wearing a tan jacket, Easterday told the officers Rhodes was the man he had seen earlier sitting in front of Karen's Nail Works. Rhodes was charged with one count of second degree burglary.

[1] Rhodes' other arguments are discussed in the unpublished portion of this opinion.

During voir dire, the prosecutor asked whether any member of the jury panel had had a particularly pleasant or unpleasant experience with a police officer that stood out in the juror's mind. Juror No. 10 responded that he had once been stopped by police officers in Denver as he was walking to his car with a friend after leaving a club. The officers told them they had been stopped because they matched the descriptions of two individuals who had just committed a robbery, one of whom was African–American and one of whom was "Mexican." The stop lasted only about two minutes, and Juror No. 10 stated that he did not think the experience would affect his ability to be impartial. When the prosecutor exercised one of his peremptory challenges against Juror No. 10, defense counsel objected to the challenge as impermissibly based on race because Juror No. 10 was the only African–American juror on the panel. Based on its conclusion that a single challenge cannot constitute a pattern of discrimination, the trial court ruled that the prosecutor's challenge was permissible.

Following trial, a jury found Rhodes guilty as charged. Based on his prior convictions, including several in California, Rhodes had an offender score of 10. The trial court imposed a sentence within the standard range. This appeal followed.

### Exercise of Peremptory Challenge

■ The equal protection clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from a jury solely on the basis of race. *State v. Sanchez*, 72 Wn. App. 821, 825, 867 P.2d 638 (1994) (citing *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)). Race–based peremptory challenges violate both a defendant's equal protection right not to have members of his or her own race excluded from the jury on account of race and the equal protection rights of the excluded jurors who are denied a significant opportunity to participate in civic life.

*State v. Burch*, 65 Wn. App. 828, 834, 830 P.2d 357 (1992) (citing *Batson*, 476 U.S. at 86; *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 1370, 113 L. Ed. 2d 411, 423–24 (1991)).

The defendant has the initial burden of establishing a prima facie case of purposeful discrimination in the selection of the jury. *Purkett v. Elem*, 514 U.S. 765, 115 S. Ct. 1769, 1770, 131 L. Ed. 2d 834 (1995). First, the defendant must show the peremptory challenge was exercised against a member of a constitutionally cognizable racial group. *Burch*, 65 Wn. App. at 840 (citing *Batson*, 476 U.S. at 96). Second, the defendant must show that this fact, taken together with "other relevant circumstances," raises an inference that the prosecutor's challenge was based on the status of the venire–person as a member of that group. *Burch*, 65 Wn. App. at 840. Relevant circumstances may include a pattern of strikes against members of a particular racial group or the particular questions asked by the prosecutor during voir dire. *Burch*, 65 Wn. App. at 840.

If the defendant establishes a prima facie case of purposeful discrimination, the burden shifts to the State to " 'articulate a neutral explanation related to the particular case to be tried.' " *Burch*, 65 Wn. App. at 840 (quoting *Batson*, 476 U.S. at 98). *See also Purkett*, 115 S. Ct. at 1770. This must be more than a general denial of discriminatory intent. *Burch*, 65 Wn. App. at 840. Thus, in determining whether a prosecutor's explanation is based on discriminatory intent, courts consider whether the prosecutor has stated a reasonably specific basis for the challenge, such as specific responses or the demeanor of the juror during voir dire, or a particular identifiable incident in that juror's life. *See Burch*, 65 Wn. App. at 840.

■ The trial court must then determine whether purposeful discrimination did in fact occur. *Purkett*, 115 S. Ct. at 1770–71; *Burch*, 65 Wn. App. at 840. Because the question whether the prosecutor's race–neutral explanation should be believed depends on an evaluation of demeanor and credibility that lies " 'peculiarly within a

trial judge's province,' " his or her determination "represents a finding of fact of the sort accorded great deference on appeal." *Sanchez*, 72 Wn. App. at 826 (quoting *Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)). We will not disturb the trial court's determinations of whether a prima facie case has been established and whether there was a discriminatory purpose behind the State's use of its peremptory challenges unless it is clearly erroneous. *State v. Wright*, 78 Wn. App. 93, 99, 896 P.2d 713, *review denied*, 127 Wn.2d 1024 (1995); *Burch*, 65 Wn. App. at 840–41 (citing *Hernandez*, 111 S. Ct. at 1871).

The prosecutor's initial question and Juror No. 10's response was as follows:

[PROSECUTOR]: . . . How many people here would have what they consider an unpleasant or pleasant experience with a police officer that really stands out in your mind? I don't mean, you know, one like getting a ticket — that sort too, but some sort of experience with a police officer that you deem particularly pleasant or particularly unpleasant.

Is there anyone here who can think of such an incident? Not a single person?

A JUROR: Well, I can.

[PROSECUTOR]: Who spoke up? Oh, Juror No. 10. Could you tell me about your experience?

JUROR NO. 10: Well, I was in Denver, and a friend of mine and I had come from a club, and we were going to our car, and I was waiting for traffic, and a police officer or car pulled up with their lights on. So they got out of the car. One of the officers came beside our car, and the other officer was on the curb. And the unfortunate part about this is the guy that was on the curb was kind of nervous. He had like a handgun, which kind of scared us. They said we . . . fit the description of someone who had just committed a robbery. It was a black and Mexican. And the friend that I was with was black as well, so we looked at each other, well, which one of us is supposed to be Mexican? So it was kind of weird.

[PROSECUTOR]: What was the eventual result of that? Did it clear itself up pretty clearly?

JUROR NO. 10: Yes. He said, well, we just had to check.

[PROSECUTOR]: Did they even put you under arrest, or did they just talk to you through the car?

JUROR NO. 10: No, it took about all of two minutes. And the guy checked my ID and Charles' ID and let us go.

[PROSECUTOR]: Do you know why they picked your car to stop?

JUROR NO. 10: Because we fit the description of whatever, you know. I don't know. Charles had a Jeri Curl, so we figured he was supposed to be the Mexican. But it's been a source of some amusement. I guess he gets to tell that story a lot.

[PROSECUTOR]: Is there anything about that experience — You have heard there will be a number of witnesses who are police officers in this case. Is there anything about that experience that would make you unable to judge this case impartially at all?

JUROR NO. 10: I don't think it would affect me negatively.

Later, in the context of discussing what motivates a police officer to solve a crime, the prosecutor returned to the incident Juror No. 10 first described:

[PROSECUTOR]: Juror No. 10, I know you were incorrectly picked up. What do you think about the officer who incorrectly picked you up?

JUROR 10: What led them to incorrectly stop us?

[PROSECUTOR]: Yes.

JUROR 10: They were going on information. They said that they had been given a description of two people who had just committed a crime within the last ten minutes or something, so they thought that they stumbled onto those two people. I assume, according to the descriptions they were given, we must have fit that.

[PROSECUTOR]: How long did they detain you?

JUROR 10: Less than two minutes.

Defense counsel then raised the question whether Juror No. 10 felt race had influenced the stop:

[DEFENSE COUNSEL]: [Juror] Number 10, what role, if any, do you think your race played in your stop with the cops? Well, besides the description being a black male?

JUROR 10: I don't understand the question.

[DEFENSE COUNSEL]: Did you think that your race influenced the fact that you were stopped or not?

JUROR 10: Beside — I don't think so. The Denver police force has been accused of being somewhat biased. Two officers stopped us and one was an Indian or Native American. And I don't think, based on what they told us, I don't think it was unreasonable for them to do what they did, except Charles was a little insulted.

[DEFENSE COUNSEL]: You think I'm crazy for asking the question, though?

JUROR 10: No, I assume you have some reason.

[DEFENSE COUNSEL]: Why, thank you.

I'm asking this because, actually, the potential about this, I think with the black community, African American community, about whether black people tend [to] get stopped more than white people, do you think that happens or not?

JUROR NO. 10: Yeah, I think that happens probably, yes.

After counsel informed the trial court at sidebar against which jurors they intended to exercise their peremptory challenges, one of whom was Juror No. 10, counsel made the following statements for the record:

[DEFENSE COUNSEL]: . . . The side bar we had right before the challenges, the prosecutor indicated to the Court that he intended to challenge Juror Number 10. Juror Number 10 was the only black juror on the entire panel. Mr. Rhodes, of course, is black. And the Court stated the two prong test, which I do believe is accurate, that to make the challenge there must first be a pattern of discrimination. And

then if there is such a pattern, the State is required to put forth non [sic], you know, race neutral reasons for the challenge, then the Court can rule on whether there is an intent to discriminate.

I believe that there, while it's not much of a pattern, I think it's enough of a pattern that even challenging this one juror is sufficient to establish the necessary pattern. Given that he is the only black juror on the entire panel, he is pretty much the only chance there is of having . . . any black person on the panel at all. So, I think that even challenging this one juror does establish enough of a pattern to require the State to put forth race neutral reasons to rule on those reasons.

THE COURT: Mr. McDonald, do you wish to indicate anything at this point for the record?

[PROSECUTOR]: Certainly. For the record, Your Honor, I set forth the reasons which I believe does not have to rise to the level of a challenge for cause and, that is, [Juror No. 10] had indicated, in fact, he is the only one that raised his hand to the question about unpleasant experience with a police officer. He is the only juror who had been stopped and questioned as a suspect in a criminal case. And, while he made light of it, it was a concern. I think the State's position is race neutral. I would be concerned about any juror who responded in that manner, white, black, [H]ispanic, who had been stopped as a suspect in a criminal case particularly given [that] the defense in this case [is] that this defendant was improperly stopped, that he was assumed to be a criminal when he was not.

The Defense, I will note, and I believe the Court agrees, . . . striking one juror cannot be evidence of a pattern. I will also note that there were two jurors, not of African American descent, but who are clearly visibly members of minority groups . . .

THE COURT: As I indicated, I . . . certainly have no information about [this prosecutor's] behavior in the past of having a pattern to it. I don't believe that challenging Juror Number 10 itself, because he is the only black man on the panel, can constitute pattern. I did indicate that I don't believe that [Juror No. 10's] answers indicated that he an

unpleasant contact with the officer, although, that was the question that he responded to. He's a very mature, very poised man, who indicated that he even, he and his friend joked about the ridiculousness of the reason the police officer gave and that . . . the police officers thought that his friend might have been Mexican–American, that they had a logical basis for stopping them and inquiring.

At any rate, it certainly is an arguable reason but because I can't find a pattern, I don't get to the second prong of the test. So, I will simply indicate that under the Supreme Court steps, there does not appear to be an inappropriate challenge here, certainly not one I can do anything about.

There is no question that Juror No. 10 is a member of a constitutionally cognizable racial group. The issue thus becomes whether this fact, together with other relevant circumstances, establishes a prima facie case that the prosecutor's challenge was motivated by a discriminatory purpose. Rhodes argues that the trial court erred in concluding that a single challenge, even to the only African–American juror on a panel, cannot constitute a pattern. Even if the challenged juror is the only African–American juror on the panel, we have generally been reluctant to find that exclusion of a single juror establishes a pattern or to find discriminatory motivation based on numbers alone. *Wright*, 78 Wn. App. at 102; *State v. Ashcraft*, 71 Wn. App. 444, 459, 859 P.2d 60 (1993). However, we have also recognized that the prosecutor's dismissal of the only eligible African–American juror may imply a discriminatory act or motive. *Wright*, 78 Wn. App. at 101; *see also United States v. Armstrong*, No. 95–157, 1996 WL 241682, at 11 (U.S. Cal. May 13, 1996) ("the significance [of a challenge to a black juror] may differ if the venire consists mostly of blacks or of whites"). Because Juror No. 10 was the only African–American juror on the panel, the trial court should have continued with the next step of the analysis and asked the prosecutor to articulate the reason for the challenge. The trial court should then have determined, based on the circumstances and that explana-

tion, whether purposeful discrimination did in fact occur.[2] Although here the trial court did not make such a finding, the prosecutor did state his reasons for challenging Juror No. 10 for the record. This, together with the other evidence in the record, permits us to conclude that the challenge was not exercised on discriminatory grounds.

The prosecutor said that he challenged Juror No. 10 because he was improperly stopped by the police. Rhodes himself concedes Juror No. 10 was the only juror among the 30 members of the panel who had been stopped for something he didn't do. The prosecutor's follow-up question, "What do you think about the officer who incorrectly picked you up?" was directed simply at further exploring the juror's reaction to an unpleasant experience.[3] The State may properly inquire about any potential bias against its main witnesses who were police officers. Although Juror No. 10 stated that he believed the experience would not affect his ability to be impartial, his spontaneous description of the event included the statement that the incident scared both him and his friend because of the apparent nervousness of the officer with the handgun and that "it was kind of weird."[4] In the context of a case where the defense is that the defendant was mistakenly accused of committing the crime simply

---

[2]This analysis must be confined to the four corners of the case then before the trial court. "The trial judge need not review prosecutorial conduct in relation to other venires in other cases." *Armstrong*, 1996 WL 241682, at 11.

[3]Rhodes contends that the prosecutor's failure to ask similar follow-up questions of two other jurors who responded that they agreed that the police stop African-Americans more frequently than whites supports an inference of prejudicial intent. The record *does not* support this argument. The only follow-up question the prosecutor asked Juror No. 10 referred to the specific incident he had described. Defense counsel's question whether jurors believed African-Americans are stopped more frequently than whites came later during voir dire. Thus, the prosecutor's follow-up question could not have been motivated by Juror No. 10's answer to defense counsel's later questions about race-motivated stops.

[4]This incident was, in fact, just one of two Juror No. 10 described in which he felt he was unfairly stopped by police. In response to a question by the prosecutor as to whether anyone had ever been accused by the police of something they did not do, Juror No. 10 responded that he had recently been given a traffic ticket he regarded as "[t]otally inappropriate."

because he happened to be at the scene, this was a legitimate basis for exercising a peremptory challenge.

Contrary to Rhodes' contention that the prosecutor improperly focused on race, it was defense counsel who prodded Juror No. 10 about the degree to which he felt his race had played a role in the improper stop. As this court noted in *Wright*, the *Batson* court was concerned with purposeful discrimination by the prosecutor. 78 Wn. App. at 102. It is thus significant that Juror No. 10's comments about race, except as an element of the description of the two people the Denver police were seeking at the time they made the stop, were all elicited not by the prosecutor but by defense counsel. *See Wright*, 78 Wn. App. at 102. Even if this were not the case, a prosecutor may legitimately be more concerned about an individual who has personally experienced being singled out by the police, based on his race, for something he did not do than about jurors of any race who think, in the abstract, that the police stop African–Americans more often than whites.

Although there is no question that Juror No. 10 was a member of a constitutionally cognizable racial group, neither the prosecutor's questions nor his explanation of the reasons for his challenge raises an inference that that challenge was motivated by a discriminatory purpose.

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

Affirmed.

KENNEDY, A.C.J., and GROSSE, J., concur.