**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**MARCH 31, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37645-1-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 37718-1-III[1]) |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| AMY SUE BROWN, | ) | |
| | ) | |
| Appellant. | ) | |

STAAB, J. — After a night of heavy drinking, Amy Brown shot and killed her friend, Amanda Hill. At trial, she claimed self-defense. The jury found her guilty of felony murder. On appeal, Ms. Brown argues that her trial attorney was constitutionally ineffective for two reasons. First, she contends that her attorney failed to argue that our Supreme Court's extension of the *Batson*[2] test in *State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018), should apply to an objection based on gender discrimination. In the alternative, she contends that even under a traditional *Batson* analysis, the trial court

---

[1] *State v. Brown*, No. 37718-1-III, was consolidated and dealt with a denied postconviction CrR 7.4 arrest of judgment motion and a CrR 7.5 new trial motion asserting evidence insufficiency. Ms. Brown failed to brief these collateral attacks so they are not addressed and her appeal in this case is denied. RAP 10.3.

[2] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

erred in denying her objections. Second, she contends that her attorney proposed jury

instructions that effectively lowered the State's burden of proving self-defense. Ms.

Brown also challenges the admission of a photograph of the victim at trial and raises

issues of prosecutorial misconduct and cumulative error.

We reject these issues. We hold that Ms. Brown's attorney was not

constitutionally ineffective for failing to argue that the holding in *Jefferson*, pertaining to

objections based on race and ethnicity, must necessarily apply to objections based on

gender. In addition, we conclude that the trial court's application of the *Batson* test to the

State's use of peremptory challenges on six female jurors was not clear error. We also

decide that Ms. Brown's trial attorney was not constitutionally deficient for proposing

jury instructions on self-defense because the instructions accurately reflect the law. Next,

we find that the trial court did not abuse its discretion by admitting an old photograph of

the victim with her then-toddler son. Finally, we conclude that under the heightened

burden for unpreserved error, Ms. Brown fails to establish prosecutorial misconduct that

requires reversal. In reaching these conclusions, we necessarily reject Ms. Brown's claim

of cumulative error and affirm the conviction.

## BACKGROUND

Amy S. Brown was charged with murder in the second degree under

RCW 9A.32.050(1)(b) for the felony assault in the second degree of Amanda Hill, which

caused her death. The case went to trial.

2

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

The circumstances surrounding the assault and Ms. Hill's death were revealed at trial.  Ms. Brown's boyfriend testified that everyone was drinking heavily on the night of Ms. Brown's birthday party.  He went to bed around midnight.  Ms. Brown's child was sleeping in the house.  Ms. Hill came into the boyfriend's room and woke him up.  Ms. Brown entered the room, yelled "'I knew it,'" and left.  Report of Proceedings (RP) at 570.  The interaction in the room was caught on video and played for the jury.  Both women left the room.

Three minutes later, the boyfriend heard a gunshot and ran out of the room.  Ms. Brown had shot Ms. Hill with a .38 revolver at point-blank range, killing Ms. Hill.  The trajectory of the bullet wound was "front to back, downward and left to right" with entry at the left breast and exit near the spine.  RP at 1113.  Ms. Hill also had contusions consistent with a struggle.  The women were up against a white sport utility vehicle in the driveway near the home's back door when police arrived.  Blood spatter, blood smear, and smeared dirt appeared on the vehicle's passenger side front door and running board.

Officers took Ms. Brown into custody and interviewed her.  She did not have dirt on the front or back side of her clothes.  She did not have apparent injuries attributed to the incident.  Three police interview recordings of Ms. Brown totaling two hours were played for the jury.

During the interview, Ms. Brown said that she went outside to smoke after seeing Ms. Hill in her boyfriend's bed and was pushed from behind.  The push caused her to fall

3

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

forward and she rolled over, at which point Ms. Hill got on top of her near where the

cement and dirt met and put her hands around Ms. Brown's throat and mouth.  Her

airway was not obstructed.  She told Ms. Hill to get off her.  She believed that Ms. Hill

was trying to choke her.  She did not believe that Ms. Hill was trying to kill her.  With

Ms. Hill on top of her, Ms. Brown opened the car door, retrieved the gun from the door,

removed it from a holster, and shot Ms. Hill.  Ms. Brown did not believe that Ms. Hill

was trying to hurt her.  Ms. Brown said she "fucked up."  RP at 1354.

During trial, Ms. Brown's testimony was not consistent with her interview.  She

stated that Ms. Hill "postured and screamed at me and tackled me flat on the ground."

RP at 1468.  She stated that she was terrified.  She denied being jealous of her boyfriend

and Ms. Hill.  The State's blood spatter expert testified that Ms. Hill's version of events

was inconsistent with the physical blood evidence on the clothes and car.  He concluded

that it was not possible that Ms. Hill was shot while straddling Ms. Brown's torso leaning

forward face to face.  Ms. Hill was seven inches taller than Ms. Brown.

The jury found Ms. Brown guilty, and she appeals.

ANALYSIS

A.     PEREMPTORY CHALLENGES AND GENDER BIAS

At trial and on appeal, Ms. Brown challenges the State's use of six of its seven

peremptories to remove female jurors.  The State waived its seventh peremptory.  Ms.

Brown exercised all seven of her peremptory challenges, removing five men and two

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

women.[3]  The final jury consisted of eight men and four women with one male and one

female alternate.  According to the "Panel Random List," of the 88 person venire, 46

were men and 42 were women.  Clerk's Papers (CP) at 120-23.  Among the first 40

potential jurors, there were 21 men and 19 women.

Before considering whether the trial court erred, we must determine which test to

apply.  At trial, defense counsel objected to the State's peremptory challenges but

acknowledged that since the basis of the objection was gender not race, GR 37 did not

apply, and the court should apply the *Batson* test.  After applying the *Batson* test, the

court found that the record supported the State's gender-neutral reasons for striking the

jurors and Ms. Brown had not demonstrated purposeful discrimination.

On appeal, Ms. Brown concedes that GR 37 does not apply to an objection based

on gender discrimination and acknowledges that she urged the trial court to apply a

traditional *Batson* test to her objections.  Nevertheless, she asserts that the trial court

should have applied the modified *Batson* test as declared in *Jefferson*.  Ms. Brown did not

ask the trial court to apply a modified *Batson* test to her objections.  The only way she

can successfully raise this issue for the first time on appeal is to argue manifest

constitutional error (RAP 2.5(a)), or ineffective assistance of counsel.  Ms. Brown does

---

[3] Defense counsel used a peremptory challenge to strike juror 27 because of his demeanor.  During voir dire when juror 27 indicated that body language would help to determine if someone was telling the truth, defense counsel noted, "I can tell you're not happy I called on you; right?"  RP at 405.

5

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

not argue manifest constitutional error for this issue. Even if she did, invited error would preclude review of a constitutional error to which Ms. Brown contributed. *See State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009). Recognizing this doctrine, Ms. Brown argues that her trial counsel was ineffective for failing to argue the modified *Batson* test.

*Ineffective Assistance of Counsel*

Both the United States and Washington Constitutions guarantee a criminal defendant the right to effective assistance of counsel. *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018); *see also* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Courts indulge in a strong presumption that counsel is effective. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The defendant has the burden to show that counsel's performance was deficient based on the trial court record. *McFarland*, 127 Wn.2d at 335. Specifically, "the

6

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *Id*. at 336.

Ms. Brown argues that her trial attorney was ineffective because he failed to recognize and argue current case law, i.e., *Jefferson*'s modification of *Batson*. While defense counsel's failure to discover relevant case law is generally considered deficient, the failure to raise a novel legal theory is not. *See State v. Kyllo*, 166 Wn.2d 856, 868, 215 P.3d 177 (2009) (counsel failed to discover relevant case law before proposing jury instructions); *State v. Clark*, 17 Wn. App. 2d 794, 799, 487 P.3d 549 (2021), *review denied*, 198 Wn.2d 1033, 501 P.3d 132 (2022). To determine whether counsel was constitutionally deficient for failing to argue *Jefferson*, we must consider whether and to what extent *Jefferson* is relevant to an objection to peremptory challenges based on gender bias.

*The General Rule on Discrimination under* Batson

Historically, the *Batson* test was developed to determine whether the peremptory strike of a venire person was impermissibly motivated by race. *Jefferson*, 192 Wn.2d at 231. When an objection is raised, the trial court applies the three-step *Batson* test:

> First, the defendant must establish a prima facie case that "gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. Second, if a prima facie case is made, the burden shifts to the prosecutor to provide an adequate, race-neutral justification for the strike. *Id*. Finally, if a race-neutral explanation is provided, the court must weigh all relevant circumstances and decide if the strike was motived by racial animus.

7

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

*City of Seattle v. Erickson*, 188 Wn.2d 721, 726-27, 398 P.3d 1124 (2017).

In 1992, Washington applied *Batson* to gender-based discrimination in the use of peremptory challenges. *State v. Burch*, 65 Wn. App. 828, 830 P.2d 357 (1992). Two years later the Supreme Court followed suit in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), holding that the equal protection clause forbids intentional discrimination in jury selection on the basis of gender.

While *Batson* set the standard for deciding whether a peremptory strike was based on purposeful discrimination, our Supreme Court began to recognize that "a growing body of evidence shows that racial discrimination remains rampant in jury selection." *State v. Saintcalle*, 178 Wn.2d 34, 35, 309 P.3d 326 (2013) (plurality opinion), *abrogated on other grounds by Erickson*, 188 Wn.2d 721. Whereas *Batson* addressed purposeful discrimination, "racism is often unintentional, institutional, or unconscious." *Id*. at 36.

*GR 37*

To address *Batson*'s shortcoming, the Supreme Court adopted a new court rule. In 2017, the court created a workgroup to finalize a new court rule that would address the shortcomings of *Batson*. *See* PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT (Final Report).[4] The final product of this workgroup was GR 37, which became effective in 2018.

---

[4] https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/OrderNo25700-A-1221Workgroup.pdf.

8

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

The rule expands the third step of the *Batson* test. Instead of a court deciding if the peremptory challenge was motivated by racial animus, the court must decide whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge . . . ." GR 37(e). If the court so finds, then the peremptory challenge must be denied. *See State v. Lahman*, 17 Wn. App. 2d 925, 934, 488 P.3d 881 (2021). While GR 37 expands the *Batson* test, it is specifically limited to bias and discrimination based on race and ethnicity. Although gender bias was discussed within the workgroup that developed the rule, gender bias was left out of GR 37 with a recommendation that it should be added at a later date after thoughtful consideration. *See* Final Report at 5.

State v. Jefferson

In *Jefferson*, the court addressed racial bias in jury selection under the *Batson* rule. At the time of Jefferson's trial, GR 37 was not in effect. Jefferson objected to the State's use of a peremptory challenge to remove the only African-American juror on the jury venire, arguing that the strike was racially motivated. After applying a traditional *Batson* analysis, the court found that the State provided a race-neutral justification for striking the juror. The Supreme Court upheld the trial court's finding, concluding that under *Batson* it was not clear error. *Jefferson*, 192 Wn.2d at 238-39.

Nonetheless, the Supreme Court went on to find that, "Our current *Batson* test does not sufficiently address the issue of race discrimination in juror selection."

9

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

*Id.* at 239.  After reviewing the history of racial discrimination in jury selection and the difficulty of proving explicit and implicit bias under *Batson*, the court exercised its power to adopt a new analysis under the third step of the *Batson* test.  While finding that GR 37 did not explicitly apply to Jefferson's appeal,[5] the court modified the third step of the *Batson* test to incorporate GR 37's structure.  Under the new test, "the relevant question is whether 'an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge.'  If so, then the peremptory strike shall be denied."  *Jefferson*, 192 Wn.2d at 249 (quoting GR 37(e)).

 *Whether Counsel's Failure to Raise* Jefferson *was Constitutionally Deficient*

 The question before us in Ms. Brown's case is whether her attorney was constitutionally deficient for failing to argue that the holding in *Jefferson* applies to *Batson* challenges based on gender.  In light of our overview of *Batson*, GR 37, and *Jefferson*, we hold that Ms. Brown's trial attorney was not constitutionally deficient for failing to argue *Jefferson*'s application to an objection based on gender bias.

 *Jefferson*'s test was explicitly limited to race and ethnicity.  While gender was not before the *Jefferson* court, it was a consideration in the drafting and adoption of GR 37.

---

[5] While GR 37 was in effect by the time the court considered Jefferson's appeal, the court held that the rule could not be applied retroactively and was not in effect at the time of Jefferson's jury trial.  *Jefferson*, 192 Wn.2d at 249.  Thus, the issue of racial bias in jury selection was reviewed under a constitutional analysis and not under the court rule.  *Id.*

10

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

As the State points out, GR 37 does not apply to gender or any other protected status covered by the equal protection clause and our state constitution. *Jefferson* expanded *Batson* by specifically adopting GR 37's test for determining whether race or ethnicity could be a factor in a peremptory strike of a juror.

On appeal, Ms. Brown concedes that GR 37 does not apply to her objection based on gender bias. She also recognizes that *Jefferson* was likewise limited to race and ethnicity. Without citation to any direct authority, she contends that "gender-based peremptory challenges must be evaluated with the same standards applied to race and ethnicity set out in GR 37 and *State v. Jefferson*, *supra*." Am. Opening Br. of Appellant at 23. Her argument—that the standard set forth in *Jefferson* for race and ethnicity must also apply to gender—is novel because there is no authority to support this specific argument. GR 37 and the holding in *Jefferson* are based on a demonstrated history of *Batson*'s inability to move the needle on racial and ethnic bias in jury selection. Ms. Brown fails to demonstrate that racial and gender bias are so similar that they are merely interchangeable. If such were the case, gender would likely have been included in GR 37's inaugural version. Because it is not clear that *Jefferson*'s holding applies to *Batson* objections based on gender, any argument to this effect necessarily suggests an extension of existing law. In other words, a new rule or a novel argument.

To be clear, we do not hold that the modified *Batson* test does not apply to gender bias or that GR 37 will not be modified in the future to include gender or other protected

11

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

classes. Instead, the issue before us is very narrow: whether counsel is constitutionally

deficient for failing to make this argument at trial. An attorney's failure to raise novel

legal theories or arguments is not ineffective. *Clark*, 17 Wn. App. 2d at 799 (quoting

*State v. Brown*, 159 Wn. App. 366, 371, 245 P.3d 776 (2011)). Since Ms. Brown's

attorney did not raise *Jefferson* below but instead invited the court to apply *Batson* to her

objection, we will review the trial court's decision under a traditional *Batson* analysis.

       *Application of* Batson *to This Case*

       As noted above, the trial court applies a three-part *Batson* test. First, the defendant

must demonstrate a prima facie case of purposeful discrimination. *Burch*, 65 Wn. App. at

840. This is done by showing both that a peremptory challenge of a venire person was

exercised against a member of a constitutionally protected group and that "other relevant

circumstances raise an inference" that the challenge was based on that group

membership. *Id.* In deciding whether a party has demonstrated a prima facie case, the

trial court "'should consider all relevant circumstances', including a 'pattern' of strikes

against members of a constitutionally cognizable group and the 'prosecutor's questions

and statements during *voir dire* examination.'" *Id.* (quoting *Batson*, 476 U.S. at 96-97).

Other relevant circumstances include whether disproportionate use of strikes is used

against a specific group. *State v. Wright*, 78 Wn. App. 93, 99-100, 896 P.2d 713 (1995).

       In this case, the trial court did not make a preliminary finding of a prima facie case

of discrimination. Instead, the court immediately asked the State for a gender-neutral

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

explanation. Since the State provided an explanation and the court ruled on the ultimate question of intentional discrimination, the preliminary issue of a prima facie showing becomes moot.[6] *See id*. at 101.

The second step of the *Batson* test requires the striking party to provide a gender-neutral reason for striking jurors. *Burch*, 65 Wn. App. at 840. The explanation must be clear and reasonably specific. *Id*. Citation to a venire person's specific responses and demeanor during voir dire may constitute a neutral explanation for exercising a peremptory challenge. *Id.*

In response to the trial court's invitation, the State asserted that its peremptory challenges were based on demeanor and the responses given by each challenged juror and not based on gender. The State then went through each of the six stricken jurors and provided a reason for the strike. Specifically, the State noted that juror 17 expressed views on firearms and self-defense that caused concerns and comments that made the State believe she might not follow the law as instructed. Juror 22 made comments about weighing the credibility of witnesses along with presumptions and the burden of proof that raised concerns for the State. Juror 36 indicated that she was an alcoholic and made comments about the use of firearms that the State thought were unfavorable. Juror 41

---

[6] In order to avoid collapsing the *Batson* test, courts should not elicit the State's gender-neutral explanation until it has made a preliminary determination that the challenger has demonstrated a prima facie showing of discrimination. *Wright*, 78 Wn. App. at 100-01.

13

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

seemed sympathetic to recalling events in a way that was more favorable to the defense theory of the case.

The State noted that it thought juror 32's body language and posture were not favorable when questioned by the State. And while the State could not recall the exact reason it struck juror 34, it did indicate that she appeared uncomfortable and nervous during questioning. The State concluded by noting that it did not exercise all of its peremptory challenges and could have removed more women if that was its intent.

In response, defense counsel noted that statistically it was improbable that six women would be struck unless the strikes were based on gender. "I think that the standard under *Batson* is still conscious bias, not implicit bias as it is under Rule 37. I'm not sure if that standard is met in this case, but it certainly gave me concern when I noted that all six individuals were female." RP at 476. Counsel also argued that the State's explanations were not necessarily unique and could apply to other jurors left on the panel. Finally, counsel acknowledged having notes that corroborated some of the State's reasons (without indicating which reasons), but invited the court to make its own comparison and then ultimately left it to the court's discretion on how to proceed.

The third step of the *Batson* test requires the trial court to determine if the defendant has established purposeful discrimination. *Jefferson*, 192 Wn.2d at 232. Here, the trial court made the following findings:

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

> I'm persuaded that while the State's six peremptory challenges were used on women, I would note first that the rationales given are consistent with the record, and importantly, had Juror Number 27, . . . been kept on the jury, that would have undermine[d] the State's rationale because he appeared to be nervous and uncomfortable and not enjoying the process at all. However, the defense did strike him; and the fact that at the end of the day he was not left on by the State further supports the State's gender neutral rationales.
>
> I'm persuaded that there is a nondiscriminatory basis given for each of the jurors stricken. That said, each party has an obligation to bring the challenge if they think it's appropriate and each party challenged has the obligation to defend their choices.
>
> On this record, the court is satisfied and those jurors will remain.
>
> As I indicated here, the State had a seventh challenge which it could have used to remove a woman and it decline[d] to do so, further confirming the court's conclusion.
>
> So the challenge is respectfully denied.

RP at 477-78.

Since these findings depend on the trial court's determination of the credibility of the attorneys and jurors, we review them to determine if the findings are clearly erroneous. *See Burch*, 65 Wn. App. at 840-41; *State v. Rhodes*, 82 Wn. App. 192, 196-97, 917 P.2d 149 (1996); *Jefferson*, 192 Wn.2d at 234. In determining whether the defendant has shown purposeful discrimination, we consider all the relevant evidence. *Erickson*, 188 Wn.2d at 727. This includes whether the strikes disproportionately affect a certain group, the level of group representation in the venire as compared to the jury, the gender of the defendant and victim, the type and manner of the State's questions during voir dire, and similarities between those struck and individuals seated on the jury. *Wright*, 78 Wn. App. at 99-100.

15

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

After considering these factors and the circumstances of this case, we do not find that the trial court's finding was clear error. Statistically, the State's use of six peremptory challenges on women was disproportionate, but the numbers are not necessarily dispositive. The State waived its last peremptory, which could have been used to remove another woman. And Ms. Brown exercised five of her seven peremptory challenges on men. In the end, there were 9 men and 5 women on the jury. The original venire consisted of 88 persons, 46 men, and 42 women.

Ms. Brown argues that the State's reasons for excusing jurors 32 and 34 based on body language were disingenuous because juror 27, a male, also seemed nervous. But as the trial court noted, Ms. Brown herself struck juror 27 before the State had finished exercising its peremptory challenges. In other words, we do not know if the State would have left juror 27 on the panel despite similarities with jurors 32 and 34. And while the State could not recall its exact concerns about juror 34, the record indicates that she did not "fully agree" with the self-defense standard of using proportionate force and, if faced with a perceived threat, would "do what needs to be done" to "take care of" any threats to her family even if that means "going over." RP at 426. The trial court found that the record supported the State's observations. At the time this finding was made, the venire was still empaneled. Ms. Brown did not request further attempts to observe or examine jurors 32 or 34.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

On appeal, Ms. Brown attempts to demonstrate that these explanations were merely subterfuge because other jurors provided similar responses. For instance, in response to the State's concerns about juror 36, she points to jurors 3 and 33 who experienced alcohol issues either themselves or with a family member. But neither of these jurors had issues with guns. While juror 26, a male, expressed "Pro 2nd Ammendment [sic]"[7] opinions, unlike juror 17, he did not indicate it could cause him to be biased. Although we agree that there are some similarities between the seated and eliminated venire members, the responses of each juror are sufficiently unique to support the trial court's finding.

Finally, the record also supported the State's gender-neutral explanations for striking the other four jurors. Juror 17 was equivocal, answering "possibly," when asked if her strong opinions on firearms could cause her to be biased. CP at 466. Juror 22 did not know if witnesses could take the stand and not tell the truth and did not know what to look for in deciding the credibility of a witness. Juror 36 acknowledged that her strong opinions about firearms might cause her to be biased, depending on the situation. She was also unsure if her experience as a recovering addict would influence her ability to be impartial. Juror 41 was an Air Force sergeant and indicated that in her experience,

---

[7] CP at 538.

17

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

persons dealing with fatigue had more disciplinary and communication issues. Ms.

Brown does not suggest that these reasons are biased.[8]

*Conclusion*

After properly applying *Batson* to the State's peremptory challenges to six female

jurors, the trial court found that the record supported the nondiscriminatory reasons.

After reviewing the record and conducting our own analysis, we hold that the trial court's

finding was not clearly erroneous.

B.      SELF-DEFENSE JURY INSTRUCTIONS

In her second issue on appeal, Ms. Brown argues that her trial attorney was

constitutionally ineffective for proposing a jury instruction on self-defense that Ms.

Brown claims had the effect of lowering the State's burden to disprove self-defense.

At trial, Ms. Brown did not deny killing Ms. Hill. Instead, she argued and testified

that the killing was in self-defense. Both defense counsel and the State proposed several

instructions on self-defense, including 11 *Washington Practice: Washington Pattern Jury

Instructions: Criminal* 16.02 (general self-defense), 16.03 (felony justifiable homicide),

---

[8] On appeal, Ms. Brown contends that the trial court applied the wrong standard in
step three because the court indicated that it was "persuaded that there is a
nondiscriminatory basis given for each of the jurors stricken." RP at 478. Ms. Brown
argues that the test is not whether the reasons given were nondiscriminatory, but whether
the trial court is actually convinced that the strikes were nondiscriminatory. This
argument is splitting hairs. It is clear that the trial court was persuaded that the strikes
were not based on discriminatory reasons.

18

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

16.07 (act on appearances), along with a definition of strangulation, at 261, 267, 274

(5th ed. 2021) (WPIC). The court accepted the unmodified WPIC instructions.

These WPIC instructions generally mirrored the statute and common law on self-

defense. Jury instruction 12 (WPIC 16.02) included language from RCW 9A.16.050(1)

and jury instruction 14 (WPIC 16.03) included language from RCW 9A.16.050(2) as

modified by case law. In addition, the court instructed the jury that a person has the right

to stand her ground (jury instruction 20) and could act on appearances even if their

perception was incorrect (jury instruction 19):

> A person is entitled to act on appearances in defending herself, if
> that person believes in good faith and on reasonable grounds that she is in
> actual danger of great personal injury, although it afterwards might develop
> that the person was mistaken as to the extent of the danger.
> Actual danger is not necessary for a homicide to be justifiable.

CP at 195. Finally, the court defined "great personal injury" (jury instruction 13) and

felony to include assault by strangulation or suffocation (jury instructions 15 and 16).

CP at 189, 191-92.

On appeal, Ms. Brown challenges the instructions on self-defense as misstating the

law. Specifically, she contends that "[u]nlike RCW 9A.16.050(1), RCW 9A.16.050(2)

does not require the slayer reasonably to fear great personal danger." Am. Opening Br.

of Appellant at 42. She continues that since jury instruction 19, "act on appearances,"

was not limited to self-defense under the first alternative of the statute, the jury could

have been misled to believe that Ms. Brown needed to be in fear of great bodily injury

19

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

before she could use a lethal level of force to defend against a felony assault already in progress.

Not only did Ms. Brown fail to raise this objection below, but she proposed the instructions she now claims are defective. Generally, objections to jury instructions must be made at trial or they are considered waived. RAP 2.5(a). An erroneous self-defense jury instruction may be challenged for the first time on appeal if it constitutes a manifest constitutional error. *Kyllo*, 166 Wn.2d at 862. But even errors of a constitutional magnitude will not be reviewed when they are invited. *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002). Only in the context of ineffective assistance of counsel may deficient instructions proposed by defense counsel be considered for the first time on appeal. *State v. Rodriguez*, 121 Wn. App. 180, 184, 87 P.3d 1201 (2004) (quoting *State v. Aho*, 137 Wn.2d 736, 744-45, 975 P.2d 512 (1999)).

The test for determining whether counsel is constitutionally ineffective is set forth above. Essentially, Ms. Brown needs to demonstrate that her attorney's actions were deficient, and the deficiency caused prejudice. *McFarland*, 127 Wn.2d at 334-35. Proposing a detrimental instruction, even when it is a WPIC, may constitute ineffective assistance. *Aho*, 137 Wn.2d at 745-46. Claims of ineffective assistance of counsel present mixed questions of law and fact and are reviewed de novo. *Lopez*, 190 Wn.2d at 116-17. Whether jury instructions sufficiently state the law is also reviewed de novo. *State v. Clark-El*, 196 Wn. App. 614, 619, 384 P.3d 627 (2016).

20

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

Instructions are sufficient if they permit each party to argue their side of the case, are not misleading, and when read as a whole, properly inform the jury of the applicable law. *State v. Mark*, 94 Wn.2d 520, 526, 618 P.2d 73 (1980). Self-defense instructions must do more. *Rodriguez*, 121 Wn. App. at 185. Read as a whole, they must make the relevant legal standard manifestly apparent to the average juror. *Id*.

*Law on Self-Defense*

To determine if Ms. Brown's attorney proposed a detrimental jury instruction on self-defense, we must consider the law on self-defense. Homicide is justifiable when committed either:

> (1) In the lawful defense of the slayer, . . . when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . , and there is imminent danger of such design being accomplished; or
> (2) In the actual resistance of an attempt to commit a felony upon the slayer . . . .

RCW 9A.16.050. Here, both alternatives of justifiable homicide from RCW 9A.16.050 were provided to the jury, so the State was required to disprove both means. As explained in *State v. Brightman*, whereas RCW 9A.16.050(1) concerns a reasonable fear that the person slain is about to commit a felony or inflict great bodily injury, subsection (2) "addresses situations in which a felony or attempted felony is already in progress." 155 Wn.2d 506, 521, 122 P.3d 150 (2005).

21

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

In *Brightman*, the defendant was convicted of second degree murder. At trial, he claimed that the victim was in the process of robbing him when he shot the victim during the struggle. The defendant acknowledged, however, that he had no fear of the victim during the struggle over a small amount of money. Based on these facts, the superior court refused to instruct the jury on justifiable homicide to resist a felony in progress pursuant to RCW 9A.16.050(2). On appeal, Brightman raised the exact argument that Ms. Brown raises in this case, claiming that "when a defendant has acted in actual defense of an attempted violent felony, he or she need not show fear of great bodily harm or death in order to receive a justifiable homicide instruction." *Brightman*, 155 Wn.2d at 518-19. The Supreme Court rejected Brightman's argument, as we reject Ms. Brown's.

In *Brightman*, the court held that not only must deadly force be reasonable, it must also be necessary. *Id*. at 520. "Justifiable homicide, and indeed all self-defense, is unmistakably rooted in the principle of necessity. Deadly force is necessary only where its use is objectively reasonable, considering the facts and circumstances as they were understood by the defendant at the time." *Id*. at 521. Quoting its prior decision in *State v. Nyland*, 47 Wn.2d 240, 243, 287 P.2d 345 (1955), the court noted that "'a killing in self-defense is not justified *unless* the attack on the defendant's person threatens life or great bodily harm.'" *Brightman*, 155 Wn.2d at 522. Thus, even when a person is being attacked, the amount of force used must be reasonably necessary in light of the circumstances. *Id*. Because Brightman admitted that he did not *fear* the victim, lethal

22

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

force was not necessary, and the trial court was justified in refusing to give the self-defense instruction. *Id*.

The holding in *Brightman* dispels Ms. Brown's argument that self-defense under RCW 9A.16.050(2) does not require the slayer to reasonably fear great personal injury before using deadly force. Without acknowledging the holding in *Brightman*, Ms. Brown relies on *State v. Ackerman*, 11 Wn. App. 2d 304, 453 P.3d 749 (2019). In *Ackerman*, Division One of this court held that under RCW 9A.16.050(2), the use of deadly force to resist a robbery may be reasonable even if there is no reasonable belief of imminent danger of death or great personal injury. *Ackerman*, 11 Wn. App. 2d at 314-15. The *Ackerman* court limited *Brightman*'s holding to a requirement that force used in response to a felony in progress be reasonable. *Id*. at 314. But *Brightman* also held that the force used must be necessary and when the force is lethal, it is only necessary when used to defend against a threat to life or great bodily harm. 155 Wn.2d at 522.

We conclude that *Brightman* is controlling and decline to follow *Ackerman*. *See* 13B, Seth A. Fine, Washington Practice: Criminal Law and Sentencing, § 41:6 (3d ed. & Supp. 2021) (Judicial interpretation—Self-defense—Deadly force) (recognizing that *Ackerman*'s holding conflicts with *Brightman*). Because *Brightman* held that lethal force must be reasonably necessary, and necessary means in response to a perceived threat to life or great personal injury, we conclude that the unmodified WPIC

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

instructions in this case accurately reflected the law on self-defense. Thus, Ms. Brown's

attorney was not constitutionally deficient in proposing these instructions.

C.      ADMISSION OF PHOTOGRAPH WITH CHILD

In her third issue on appeal, Ms. Brown challenges the trial court's admission of a

photograph of the victim with her child. Ms. Brown contends that the trial court abused

its discretion because the photograph was irrelevant and unduly prejudicial.

The State admitted numerous scene photos of Ms. Hill's body and autopsy photos

at trial. Ms. Brown admitted photos of Ms. Hill's body and a 2017 photo of Ms. Hill with

Ms. Brown and her family members. The State also sought to admit a photo of Ms. Hill

with her son from 2007-08 as an "in-life" photo. Ex. 1. Taken 10 years before the

charged incident, the boy appears to be three years old in the photo. Defense counsel

objected on four grounds: late disclosure, authentication, relevancy, and eliciting an

emotional response. Only the relevancy and eliciting emotional response grounds are

before us on appeal.

The State claimed that the "in-life" photo of Ms. Hill was the only one provided to

the State by her family. The court also acknowledged that the State was not required to

accept a stipulated photo from Ms. Brown. The court found the photo to be relevant "in

the first instance to show identity." RP at 491. The court did not find the photo

inherently prejudicial since many other autopsy photos with greater prejudicial value had

been admitted. The trial court then considered the specifics of the photo of Ms. Hill and

24

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

her child being a time in the past and allowed the admission of the photo and

acknowledged concerns of evoking an unfair emotional response.  The court concluded:

> [H]aving in mind the photographs intended to be submitted and having in
> mind provisionally that at least some of those photographs would be
> considered relevant and admissible, and the way in which they depict the
> deceased, in combination with the fact here that the anticipated evidence
> will be that the defendant, Ms. Brown, is also a mother and that her child
> will be the subject of at least some testimony, mitigates the prejudice of the
> decedent being depicted with a child herself.
>
> And so while this court believes that the potential for prejudice of
> the picture with the child is at least as great as the pictures with K9s [pets]
> or with a larger family depicted.  Under these circumstances, in light of the
> existing case law, this court cannot find that it is unduly prejudicial in light
> of the other anticipated evidence.
>
> . . . [A]dmission is appropriate.

RP at 493-94.

Washington courts have long upheld the admission of prejudicially gruesome

photos of murder victims.  *State v. Gentry*, 125 Wn.2d 570, 607-09, 888 P.2d 1105

(1995); *State v. Lord*, 117 Wn.2d 829, 870-71, 822 P.2d 177 (1991).  Where such photos

have been admitted, photos showing the decedent as a living, breathing person are often

admitted to counterbalance the death images.  "The admission of in-life photographs lies

within the discretion of the trial court."  *State v. Finch*, 137 Wn.2d 792, 811, 975 P.2d

967 (1999) (upheld admission of photo of "in-life" photo of the deceased with his seeing-

eye dog).  In-life photos are relevant to establish the identity of a victim.  *Id*.

After relevance is established, the trial court determines whether any unfair

prejudice to the defendant outweighs the probative value of the photo.  *Id*.  Where a jury

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

has seen postmortem photos of the decedent's body, in-life photos are not inherently

prejudicial. *State v. Furman*, 122 Wn.2d 440, 452, 858 P.2d 1092 (1993). "The State

need not accept a stipulation as to identity and may insist on proving the issue in the

manner it wishes." *Finch*, 137 Wn.2d at 811. A reviewing court will only reverse

evidentiary error where there is a reasonable probability that the error materially affected

the outcome of the trial. *State v. Stenson*, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997).

Contrary to Ms. Brown's argument that the photograph was irrelevant, in-life

photographs are relevant to show the victim's identity. *Finch*, 137 Wn.2d at 811. Ms.

Brown argues that even if relevant, the aged photograph of the victim with her young son

was unduly prejudicial. She raises three theories in support of this argument. First, she

contends that the photograph was part of the State's litigation strategy based on sexist

stereotypes intended to provoke chivalrous notions by male jurors. We find no evidence

of this claim and dismiss it outright.

Second, she contends that the photograph of the victim and her son was intended

to provoke an emotional response. In *Finch*, the Supreme Court held that admission of

in-life photographs of a murder victim with his seeing-eye dog was not unduly

prejudicial. *Id.* at 811-12. The *Finch* court noted that the in-life photograph was just a

fraction of the many exhibits admitted and the seeing-eye dog was part of the victim's

identity.

26

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

Likewise, in this case, the single in-life photograph of the victim with her son was one of many gruesome crime scene and autopsy photographs admitted by both parties, and the jury was already aware from testimony that both Ms. Brown and the victim had children. We conclude that the trial court did not abuse its discretion in finding that the in-life photograph of the victim with her son was relevant and not unduly prejudicial.

Ms. Brown's third theory of prejudice is that the State compounded the error in closing argument by superimposing a caption over the photograph with the word "Murdered." Am. Opening Br. of Appellant, App. C (Trial Ex. B). This argument is not necessarily about the photograph itself as much as it argues prosecutorial misconduct, which we review in turn.

D.    PROSECUTOR'S MISCONDUCT IN CLOSING

Ms. Brown's fourth argument on appeal is that the prosecutor committed misconduct in closing arguments by shifting the burden of proof and appealing to emotion. Specifically, she raises four allegations, arguing that the State committed misconduct by (a) commenting in opening that everyone was present because of Ms. Brown, (b) using a PowerPoint photo of the victim with her child labeled "Murdered" in closing, (c) calling the defense theory a "claim" throughout trial, and (d) calling Ms. Brown's actions "stupidity."

At the beginning of its closing argument, the State displayed the in-life photograph of the victim with the words "Amanda Hill" and "Murdered" superimposed on the

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

photograph.  Am. Opening Br. of Appellant, App. C.  The State began its closing

argument by commenting that "we are all here because of defendant, Amy Brown.  More

importantly, though, we are here because who could not be here today?  Amanda Hill.

Amanda Hill is not here because she was murdered by the defendant, Amy Brown."

RP at 1559.

While arguing its theory of the case, the State asserted that the evidence did not

support Ms. Brown's version of events and indiscriminately referred to her testimony and

theory of defense as a "claim."  "What's at issue is the defendant's claim that she used

self-defense . . . ."  RP at 1561.  "[A]ll the evidence points in a different direction.  What

that means then is that that didn't happen in the way that she claimed."  RP at 1573.  In

concluding comments, the State said that Ms. Brown "assaulted her best friend after

catching her in bed with her fiancée.  It was in no way an act of self-defense, it was an act

of jealousy and anger and stupidity."  RP at 1602.

Ms. Brown did not make any objections during closing.  After the State completed

its closing argument, Ms. Brown moved for a mistrial citing the emotional appeal of the

child in the exhibit 1 "in-life photo," the statement that "the only person still alive is Ms.

Brown," and the State's use of the word "stupidity."  RP at 1576, 1602.  She did not

object to the use of the word "Murdered."  She did not object to the State's use of the

word "claim," which appeared five times during closing.  The court denied Ms. Brown's

motion for a mistrial.  On appeal, Ms. Brown raises four instances as evidence of

28

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

prosecutorial misconduct but does not assign error to the trial court's denial of her motion for a mistrial.

"'In order to establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality opinion)). A defendant's failure to object waives the error, and we will reverse for prosecutorial misconduct during closing only if "the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). "In other words, a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *Id*.

Ms. Brown failed to object to any of these arguments as they were being made. After the State finished its closing argument, and before defense counsel began his closing argument, Ms. Brown's attorney asked for a sidebar and listed several objections, including the State's use of the photograph and the State's comment about "stupidity." In denying Ms. Brown's motion for a mistrial, the court noted that the photograph was displayed for a short time. Ms. Brown's objections, lodged after the State had finished closing arguments, are insufficient to preserve the issue. Objections during closing

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

arguments are necessary to correct the error, prevent it from reoccurring, and to prevent abuse of the appellate process. *State v. Emery*, 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012). Following her multiple objections, Ms. Brown did not ask for a curative instruction. She asked for a mistrial. While an objection made after the State's closing argument may prevent it from happening during rebuttal, Ms. Brown did not ask for corrective action at trial.

   *Everyone Present Because of Ms. Brown*

   Ms. Brown's first contention is that the State committed misconduct by opening with the comment that "we are all here because of the defendant, Amy Brown. More importantly, though, we are here because who could not be here today? Amanda Hill. Amanda Hill is not here because she was murdered by the defendant, Amy Brown." RP at 1559. On appeal, Ms. Brown argues that this comment suggests that the trial is Ms. Brown's fault instead of acknowledging that the State was responsible for the trial by filing charges.

   Ms. Brown's characterization of the State's comment is not evident from the record. The State is entitled to argue its theory of the case. It is clear that the State's theory was that Ms. Brown murdered Amanda Hill and her actions were not done in self-defense. There is nothing improper about making this argument. The record does not support Ms. Brown's characterization of the comment as blaming her for the trial. Although it is hard to determine tone, inflection, and emphasis from the record, if there

30

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

was a concern that the comment was inflammatory as suggested on appeal, Ms. Brown

should have objected so that the trial court could lay a record and provide corrective

instructions if necessary. Otherwise, we see no error from the comment.

*Picture with "Murdered" Superimposed*

Next, Ms. Brown contends the State committed misconduct by using the in-life

photograph of Amanda Hill with her son and the caption "Murdered" superimposed on it.

Ms. Brown contends the photograph and caption were an appeal to emotion.

In *In re Personal Restraint of Glasmann*, the prosecutor's closing argument relied

extensively on a slide show presentation that superimposed captions on top of

photographic evidence. 175 Wn.2d 696, 286 P.3d 673 (2012). The captions included

phrases like "Guilty," and "Do you believe him?" *Id*. at 706 (capitalization omitted).

The court found that adding captions to the photographs amounted to unadmitted

evidence. *Id*. The court also recognized that prior case law established that it "is

improper to present evidence that has been deliberately altered in order to influence the

jury's deliberations." *Id*. Because these standards were well known when the prosecutor

in *Glasmann* intentionally presented altered photographs during closing argument, the

court found the prosecutor's misconduct to be flagrant and ill intentioned. *Id*. at 707.

In addition to finding the misconduct flagrant, the court went on to find that the

"misconduct here was so pervasive that it could not have been cured by an instruction."

*Id*. The court recognized that "'[T]he cumulative effect of repetitive prejudicial

31

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" *Id*. (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *adhered to on remand*, noted at 173 Wn. App. 1027, 2013 WL 703974).

In this case, we do not condone the use of captions on photographic evidence during closing. However, the trial court noted that the photograph was briefly displayed and not otherwise mentioned in closing. Any error was fleeting as opposed to pervasive and prejudicial. *See State v. Walker*, 182 Wn.2d 463, 472, 341 P.3d 976 (2015) (of the 250 slides used in prosecutor's closing, a significant number contained derogatory comments and personal opinions of guilt).

*Calling Self-defense the Defendant's "Claim"*

Ms. Brown also contends that the State's characterization of self-defense as Ms. Brown's "claim" inferentially shifted the burden of proving self-defense to Ms. Brown. Again, the record does not support this characterization. Instead, the State used the term to reference Ms. Brown's testimony and defense theory. Ms. Brown did not object to this term at trial and used it to refer to her own testimony and evidence. Ms. Brown's attorney argued that there was evidence that supported "Ms. Brown's claim," about the location of evidence and "Ms. Brown's claim of the events." RP at 1587, 1591.

Ms. Brown testified during her trial that she shot Amanda Hill in self-defense. The State argued that the main issue for the jury was the defendant's claim that she used

32

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

self-defense.  There was no argument suggesting that Ms. Brown had the burden to prove

self-defense.  Instead, the jury was properly instructed on the defense and the State's

burdens.  The record does not support Ms. Brown's argument that the State used the term

to shift the burden of proof on self-defense.

### Calling Ms. Brown's Action "Stupidity"

Finally, Ms. Brown asserts that the State was appealing to the jury's emotions by

arguing that the murder of Ms. Hill "was an act of jealousy and anger and stupidity."

RP at 1602.  After the State's closing, Ms. Brown's attorney moved for a mistrial,

alleging several errors, including the State's reference to the term "stupidity."  RP at

1607.  The State responded that it did not call Ms. Brown stupid.  Instead, the State was

attempting to paraphrase Ms. Brown's own comments during her interview with law

enforcement immediately after the shooting, when Ms. Brown repeatedly admitted that

she had "fucked up."  RP at 1609.  The court found that in light of the repeated use of

profanity by the defendant in describing her own actions, the exchange of "stupidity" for

"fucked up" was not unduly prejudicial.

On appeal, Ms. Brown fails to acknowledge the State's explanation and the trial

court's ruling.  Nor does she assign error to the trial court's denial of defense counsel's

motion for a mistrial based in part on the comment.  We consider the issue waived.

RAP 2.5(a).  Even assuming this error had been properly preserved, we would review a

trial court's denial of a mistrial for abuse of discretion.  *State v. Whitney*, 78 Wn. App.

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37645-1-III; No. 37718-1-III
*State v. Brown*

506, 515, 897 P.2d 374 (1995). This is because the trial court is in the best position to assess whether a remark can be cured or is so prejudicial that it requires a new trial. *State v. Dickerson*, 69 Wn. App. 744, 748, 850 P.2d 1366 (1993). Here, in light of the State's explanation, the trial court did not abuse its discretion in denying Ms. Brown's motion for a mistrial.

E.   CUMULATIVE ERROR

In her final assignment of error, Ms. Brown contends that cumulative error deprived her of a fair trial. The only possible error that we found was the State's modification of photographic evidence during closing. Because the error was not cumulative, we deny Ms. Brown's request for a new trial.

CONCLUSION

Finding no reversible error, we affirm Ms. Brown's conviction.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.

34